**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| TY EVANS,<br>    Plaintiff, | )<br>)<br>) |
| v. | )    CAUSE NO.: 3:25-CV-856-JEM<br>) |
| COMMISSIONER LLOYD ARNOLD,<br>    Defendant. | )<br>)<br>) |

**OPINION AND ORDER**

Ty Evans, a prisoner without a lawyer, moves for a preliminary injunction (ECF 15). The Commissioner has filed a response to the motion (ECF 44), and Evans has filed a reply (ECF 49).

Evans is incarcerated at Indiana State Prison (ISP) and claims to be a follower of "Modern Taoism." (ECF 17 at 2.) In 2025, he ordered a book from Amazon entitled, "Xiandai Tao Te Ching," which he claims is the primary religious text for adherents of Modern Taoism. Evans previously owned this book but claims he lost his copy during his release from prison and subsequent reincarceration. He claims the only place to buy the book is on Amazon. In July 2025, the book arrived at the prison but was confiscated by prison staff. Evans was told the package was not in compliance with Indiana Department of Correction (IDOC) Policy 02-01-103 because the sender could not be identified. Evans claims that inmates are permitted to order books from Amazon and routinely do so, but the return address on his package was listed as an Amazon fulfillment center rather than Amazon. He claims there was no security reason to confiscate his book, and that the loss of the book has hindered his religious practice and his right to the reading material of his choice.

In the screening order, Evans was granted leave to proceed against IDOC Commissioner Lloyd Arnold for monetary damages under the First Amendment and for injunctive relief under

1

both the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). (ECF 17 at 8.) He moves for a preliminary injunction requiring the Commissioner to give him the book he ordered, and to allow him to order additional books from Amazon fulfillment centers while this case is pending. (ECF 15.)

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

On the first prong, "the applicant need not show that [he] definitely will win the case." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id*. at 763 (quotation marks omitted). In assessing the merits, the Court does not simply "accept [the plaintiff's] allegations as true" or "give him the benefit of all reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022). Instead, a court must endeavor to assess the merits as "they are likely to be decided after more complete discovery and litigation." *Id.*

On the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Mandatory preliminary injunctions—"those requiring an affirmative act by the defendant"—

are "cautiously viewed and sparingly issued." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Additionally, in the prison context, the Court's ability to grant injunctive relief is limited. "[I]njunctive relief to remedy unconstitutional prison conditions must be narrowly drawn, extend no further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the violation of the federal right." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012) (citation and internal quotation marks omitted); *see also Rasho v. Jeffreys*, 22 F.4th 703, 711-13 (7th Cir. 2022) (outlining strict limitations on granting injunctive relief in  correctional setting). The Court also must consider the Supreme Court's admonition that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

The Free Exercise Clause of the First Amendment "prohibits the state from imposing a substantial burden on a central religious belief or practice" of an inmate's religion. *Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013) (internal quotation marks and citations omitted). The First Amendment also encompasses the right to free speech, including the "freedom to read." *King v. Fed. Bureau of Prisons*, 415 F.3d 634, 638 (7th Cir. 2005). Nevertheless, "[p]risons have great latitude in limiting the reading material of prisoners." *Payton v. Cannon*, 806 F.3d 1109, 1110 (7th Cir. 2015). Prisons may impose restrictions on an inmate's exercise of his First Amendment rights, provided that the restriction is reasonably related to legitimate penological objectives, including safety, security, and economic concerns. *Turner v. Safley*, 482 U.S. 78, 89–91 (1987). In determining whether a restriction is valid, the Court considers (1) whether the restriction is rationally connected to a legitimate government objective; (2) whether there is an alternative means of exercising the right; (3) what impact the restriction would have on other inmates and

staff; and (4) the existence of other options that would suggest the prison is exaggerating its concerns. *Id.* at 89-91. It is the prisoner's burden to show that the prison's regulation is unreasonable. *Jackson v. Frank*, 509 F.3d 389, 391 (7th Cir. 2007).

RLUIPA also offers protections to inmates in the exercise of their religion and prohibits a government actor from imposing a substantial burden on "any exercise of religion [by an inmate], whether or not compelled by, or central to, a system of religious belief." *Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012); *see also* 42 U.S.C. § 2000cc-5(7)(A). RLUIPA only provides for injunctive relief against state officials, not monetary damages. *Sossamon v. Texas*, 563 U.S. 277, 285 (2011). To state a claim under RLUIPA, an inmate must plausibly allege that an aspect of his religious practice has been substantially burdened. *Id.* At a later stage, the burden shifts to the defendant to show that the challenged conduct is the least restrictive means of pursuing a compelling governmental interest. *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005).

As a preliminary matter, it can be discerned from Evans's reply that he has now received the Modern Taoism book that he ordered. (ECF 49 at 2). He does not identify any other religious book he is presently being denied in a manner that substantially burdens his religious practice, so as warrant emergency injunctive relief under the First Amendment Free Exercise Clause or RLUIPA.[1] Thus, what remains is his request to be allowed to order other books of his choosing from Amazon fulfillment centers while this case is pending, in accordance with his general right to reading materials under the First Amendment. In Evans's view, Amazon fulfillment centers are a part of the "Amazon empire" and involve no additional threat to prison security than materials

---

[1] He argues that his Modern Taoism book could possibly become damaged at some point and need to be replaced (ECF 49 at 11), but the court finds this too speculative a basis to grant him emergency injunctive relief, particularly in light of the strict limitations on granting injunctive relief in the prison setting. *See Westefer*, 682 F.3d at 681.

sent directly from Amazon. He believes the policy is thus arbitrary and unnecessary. (*See* ECF 13, 15, 49.)

The Commissioner has submitted evidence. Under Policy 02-01-103, not all packages ordered from Amazon are confiscated. (ECF 44-1 ¶13.)[2] Instead, the policy prevents inmates from receiving packages from "unknown" vendors and third-party fulfillment centers and is designed to ensure that IDOC can identify the actual sender of the package. (*Id.* ¶14; ECF 44-2 at 10, 23.) Exceptions can be made, but the inmate or sender must seek prior approval from the Warden of his or her facility. (ECF 44-2 at 23; ECF 44-1 ¶ 16.) The requirement that printed material come from verified commercial sources or a preapproved sender represents an attempt by IDOC to accommodate security needs while still efficiently processing inmates' packages containing printed materials. (ECF 44-1 ¶¶ 35-42.)

Simply because reading material comes from Amazon does not mean it is from a publisher, distributor, or other legitimate business. (*Id.* ¶ 17.) Any person, including an inmate's friends or relatives, could create an Amazon account and list items for sale on Amazon's website. (*Id.* ¶ 18). The IDOC is unaware of any procedure by which Amazon vets its sellers or reviews materials purchased through its website to ensure that they do not raise safety or security concerns. (*Id.* ¶ 19.) Thus, IDOC policy requires the actual sender of a package to be identified on the package so that Internal Affairs officers can quickly research the sender and verify that the sender is a legitimate vendor. (*Id.* ¶ 20.)

---

[2] Evans attacks the sufficiency of the affidavit submitted by an Internal Affairs officer, but he offers nothing to suggest that the affidavit is not based on the officer's personal knowledge. As such, the affidavit constitutes proper evidence. He also makes much of the fact that internal affairs staff initially told him the package was confiscated because it did not contain a return address, which he believes to be a deliberate lie. (ECF 49 at 1-3.) This argument is confusing, but the matter is put to rest by a confiscation slip attached to his motion indicating that his package was confiscated because it was from a fulfillment center. (*See* ECF 15-1 at 2.)

Depending on how an Amazon item is sold and shipped, the actual sender may or may not be identifiable from the package. (*Id.* ¶ 21.) Amazon provides two methods for third-parties to ship items to customers. The first, which Amazon calls Fulfillment by Merchant ("FBM"), allows Amazon sellers to ship materials directly from their own location to the purchaser. (*Id.* ¶ 23.) Typically, FBM Amazon packages identify the sender and list the sender's return address, allowing Internal Affairs officers to look up the sender and quickly verify that the sender is a legitimate vendor. (*Id.* ¶ 24.) Such items are not confiscated, provided that Internal Affairs officers are able to verify that the sender is a legitimate business and that the items do not otherwise violate IDOC policy. (*Id.* ¶ 25.) The second method, which Amazon calls Fulfillment by Amazon ("FBA"), allows sellers to send items to Amazon, which then packages them and ships them to buyers. (*Id.* ¶ 26.) FBA packages do not identify the seller or the seller's address, but instead list only the address of an Amazon facility. (*Id.* ¶ 27.) Therefore, Internal Affairs officers cannot readily verify who sold the item or whether the seller is a legitimate vendor. (*Id.* ¶ 28.) Amazon itself also sells items directly to buyers, and those likewise have an Amazon warehouse listed as the return address. (*Id.* ¶ 29.) Prison staff cannot readily discern from the outside of the package whether an item came from an unknown third party using FBA or whether it was sold and shipped by Amazon itself. (*Id.* ¶ 30.)

The Commissioner has shown that the restriction is rationally connected to a legitimate government objective. Without a verified-sender requirement, an inmate's friends or family members could route printed materials through a third-party seller or fulfillment service to make the package appear to be ordinary commercial mail. This poses obvious potential security risks. Specifically, a book or publication could be altered, highlighted, or annotated to communicate messages to a current IDOC inmate, or it could be used to carry controlled substances or other

prohibited items. *Koger v. Dart*, 950 F.3d 971, 974 (7th Cir. 2020) (recognizing that books pose potential dangers in prison, including being used to exchange coded messages among prisoners). Evans believes the risk is minimal and argues that once an item is received at a fulfillment center, it is "not touched" by the seller again. (ECF 49 at 5.) However, he misses the larger point: that a book or publication could contain coded messages or prohibited items when they reach the fulfillment center. There is nothing to indicate that Amazon performs any vetting of these items, and IDOC officials are reasonably concerned about the security risks they pose.

Evans argues that an alternative would be for staff to simply inspect the contents to ensure it does not pose a security risk. However, without an identified seller or specific return address, prison staff would have to extensively vet each shipped publication, potentially examining each item page-by-page, to ensure that it contains no prohibited communications or items. (ECF 44-1 ¶ 41.) The Commissioner has submitted evidence that such a process would involve significant staff resources and result in delays in delivering legitimate printed material to inmates. The prison's "economic interest in saving staff resources is legitimate." *Jackson*, 509 F.3d at 391. Additionally, the policy actually benefits other inmates receiving legitimate publications, as it likely speeds the processing of inmate packages through prison security.

The policy also leaves alternatives for Evans and other inmates to exercise their right to read. Notably, the policy at issue is not a ban on Taoist literature, religious books, or any particular type of book. Rather, it is a neutral source-verification rule. Under the policy, Evans is free to obtain a wide array of reading materials from vendors that can be readily identified as legitimate, and there is also a process for him (or the seller) to seek preapproval if he wishes to obtain reading material from an alternate source while this lawsuit is pending.[3]

---

[3] Evans raises arguments about the availability of a book he authored pertaining to Indiana post-conviction remedies, but he was not permitted to proceed on a claim about his own book in this lawsuit. (*See* ECF 27.) He cannot be

The Commissioner has demonstrated, for purposes of the motion for a preliminary injunction, that the policy is a reasonable means of ensuring that printed material sent to the facility does not pose security concerns, while also ensuring that inmates receive legitimate printed material in a timely manner. *See Benson v. York*, No. 25-1242, 2025 WL 3090129, at \*1 (7th Cir. Nov. 5, 2025) (affirming summary judgment for prison official and agreeing that "prison's policy requiring mail to have a return address was reasonably related to legitimate penological interests, including the need to promote prison safety and conserve officers' time in connection with incoming mail of questionable origin"); *Lindell v. Frank*, 377 F.3d 655, 658 (7th Cir. 2004) ("There is no question that 'publishers only' rules that restrict prisoners from receiving hardcover books from any noncommercial sources are reasonably related to a prison's interest in preventing contraband from being smuggled into the prison."). Evans has not demonstrated an entitlement to the extraordinary remedy of a preliminary injunction.

For these reasons, the Court **DENIES** the motion for a preliminary injunction (ECF 15).

SO ORDERED this 11th day of June, 2026.

 s/ John E. Martin
MAGISTRATE JUDGE JOHN E. MARTIN
UNITED STATES DISTRICT COURT

cc:    All counsel of record
       Plaintiff, *pro se*

---

granted injunctive relief related to issues that fall outside the scope of this case. *See Westefer*, 682 F.3d at 681. In any event, if the book is only available through an Amazon fulfillment center, there is a process by which other inmates can seek preapproval to receive it.